IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JOEL W. ADELSON, M.D.,

Plaintiff,

v.

AMERICAN AIRLINES, INC., and
BRITISH AIRWAYS, PLC,

Defendants.

No. C 17-00548 WHA

**ORDER GRANTING MOTION FOR JUDGMENT ON THE PLEADINGS**

## INTRODUCTION

In this personal injury action under Article 17 of the Montreal Convention, defendants move for judgment on the pleadings pursuant to Rule 12(c). For the reasons herein, defendants' motion is **GRANTED**. Plaintiff may file a motion seeking leave to amend.

## STATEMENT

The following facts are taken from the complaint. In December 2015, plaintiff Joel Adelson, M.D., purchased air transportation from San Francisco to Delhi, India, through "One World Partner Airlines" and with American Airlines Advantage Award miles. In January 2016, Adelson returned to San Francisco via three international flights. *First*, from Delhi to Helsinki; *second*, from Helsinki to London; and *third*, from London to New York — returning to California by other arrangements. Adelson flew on defendant British Airways, PLC's flights for the second and third legs of his return journey (Compl. at 2).

Upon arrival in London at "Gate 3" of Heathrow Airport, Adelson made his way, within the secured area of Heathrow, to "Terminal 5" via "inter-terminal transportation." As he attempted to pass into the building of Terminal 5, Adelson was "suddenly and violently" struck by a large metal door closing on him without warning. The impact inhibited the use of his right arm and caused a later-diagnosed rotator cuff tendon tear, amongst other "serious and probable injury to some extent to the muscles, tendons, and other components" and "shock and other injuries." Additionally, Adelson incurred "extreme pain, disability, interruption and interference with normal activities, including those required in the exercise of his profession" as a medical doctor and lecturer associated with the University of California, Irvine (*id.* at 2–3).

Based on these allegations, Adelson made a single claim against defendants American Airlines, Inc., and British Airways, PLC, under Article 17 of the Montreal Convention, which is formally known as the Unification of Certain Rules for International Carriage by Air, Done at Montreal, May 28, 1999, S. Treaty Doc. No. 106-45, 1999 WL 33292734. Both defendants have answered Adelson's amended complaint (Dkt. Nos. 5, 7, 14).

Defendants now move for judgment on the pleadings pursuant to Rule 12(c), arguing Adelson failed to state a claim compensable under Article 17 of the Montreal Convention. This order follows full briefing and oral argument.

**ANALYSIS**

Our court of appeals has held:

> Judgment on the pleadings is properly granted when, accepting all factual allegations in the complaint as true, there is no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law. Analysis under Rule 12(c) is substantially identical to analysis under Rule 12(b)(6) because, under both rules, a court must determine whether the facts alleged in the complaint, taken as true, entitle the plaintiff to a legal remedy.

*Chavez v. United States*, 683 F.3d 1102, 1108–09 (9th Cir. 2012). To be entitled to a legal remedy under Article 17, Adelson must allege facts that show an (1) accident (2) that caused him to suffer bodily injury (3) took place on board the aircraft or in the course of any of the operations of embarking or disembarking. *Eastern Airlines, Inc. v. Floyd*, 499 U.S. 530, 535–36 (1991).

2

Defendants raise two issues with Adelson's pleading. *First*, defendants argue Adelson fails to proffer sufficient facts to satisfy the third element as to both American Airlines and British Airways — namely, that the accident did not occur in the course of any of the operations of embarking or disembarking, or on board an aircraft. *Second*, defendants argue that no claim can be made against American Airlines because American Airlines was not Adelson's contracting or actual carrier as understood under the Montreal Convention.

### 1. THE MONTREAL CONVENTION.

Both sides agree that the Montreal Convention applies here. Its predecessor, the Warsaw Convention, dates back to 1929.[1] At that time, "[m]any international air carriers . . . endeavored to require passengers, as a condition of air travel, to relieve or reduce the carrier's liability in case of injury." *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 169 (1999). The Warsaw Convention addressed that practice by creating a comprehensive liability scheme premised on a compromise between international air carriers and their global customers. That compromise prohibited the use of liability waivers by the former while limiting recovery by the latter. *Ibid*.

Seventy years later, the Montreal Convention updated this scheme. The preamble to the Montreal Convention recognized both "the need to modernize and consolidate the Warsaw Convention and related instruments" and "the importance of ensuring protection of the interests of consumers in international carriage by air and the need for equitable compensation based on the principle of restitution." Like the Warsaw Convention, the Montreal Convention sought to accomplish "uniformity of rules governing claims arising from international air transportation." *Ibid*.

The Montreal Convention supersedes the Warsaw Convention entirely. *See* Montreal Convention, Art. 55. This is important because there are some notable differences between the two treaties. For example:

---

[1] The Warsaw Convention is formally known as the Convention for the Unification of Certain Rules Relating to International Travel by Air, Oct. 12, 1929, 49 Stat. 3000, 137 L.N.T.S. 11 (1934), *reprinted in note following* 49 U.S.C. § 10105.

3

> Whereas the primary aim of the contracting parties to the
> [Warsaw] Convention was to limit the liability of air carriers . . .
> the contracting parties to the Montreal Convention expressly
> approved that treaty because, among other reasons, they
> recognized "the importance of ensuring protection of the interests
> of consumers in international carriage by air and the need for
> equitable compensation based on the principle of restitution." [ ]
> Hence, commentators have described the Montreal Convention as
> a treaty that favors passengers rather than airlines.

*Ehrlich v. American Airlines*, 360 F.3d 366, 371 n.4 (2nd Cir. 2004) (quoting the preamble to the Montreal Convention). The legal standard regarding damages also changed. Under Article 21 of the Montreal Convention, the carrier is strictly liable up to 100,000 special drawing rights (approximately $135,000). To the extent such damages exceed 100,000 SDR, the carrier is not liable so long as it can prove that the damage was not due to its own negligence. Montreal Convention Art. 21; *see Kruger v. United Air Lines, Inc.*, 481 F. Supp. 2d 1005, 1008 (N.D. Cal. Mar. 1, 2007) (Judge Marilyn Patel).

Nevertheless, most provisions of the Montreal and Warsaw Conventions are substantially the same, and, as a result, certain legal precedents developed under the Warsaw Convention have continuing application to the Montreal Convention. *See Narayanan v. British Airways*, 747 F.3d 1125, 1127 n.2 (9th Cir. 2014).

### 2. SCOPE OF LIABILITY UNDER ARTICLE 17.

Article 17 of the Montreal Convention provides:

> The carrier shall be liable for damage sustained in the event of
> death or wounding of a passenger or any other bodily injury
> suffered by a passenger, if the accident which caused the damage
> so sustained took place on board the aircraft or in the course of any
> of the operations of embarking or disembarking.

This dispute primarily concerns the meaning of "in the course of any of the operations of embarking or disembarking" in Article 17. If an air carrier succeeds in placing the occurrence of an alleged injury outside of the operations of embarking or after the operations of disembarking, they cannot be held liable under Article 17. Defendants argue that Adelson is outside this scope, asserting that our court of appeals has repeatedly held that Article 17 does not permit a passenger to recover for injuries occurring during transit through airport facilities, citing *Maugnie v. Compagnie Nationale Air France*, 549 F.2d 1256, 1261–62 (9th Cir. 1977); *Schmidkunz v.*

4

*Scandinavian Airlines System*, 628 F.2d 1205, 1207–08 (9th Cir. 1980); and *Lathigra v. British Airways PLC*, 41 F.3d 535, 540 n.6 (9th Cir. 1994). These decisions do not support defendants' proposition but they are controlling.

"Whether a passenger is embarking or disembarking is a question of federal law decided on the facts of each case." *Schmidkunz*, 628 F.2d at 1207. *Maugnie*, the controlling decision for both *Schmidkunz* and *Lathigra*, expressly rejected creating an inflexible rule like the one defendants proffer. Our court of appeals instead "requires an assessment of the total circumstances surrounding a passenger's injuries, viewed against the background of the intended meaning of Article 17." *Maugnie*, 549 F.2d at 1262. *Maugnie* did not state the intended meaning of Article 17 but it did settle on a "more flexible interpretation of the language in Article 17" after explaining the flexible approaches employed in *Day v. Trans World Airlines, Inc.*, 528 F.2d 31, 38 (2nd Cir. 1975), and *Evangelinos v. Trans World Airlines, Inc.*, 550 F.2d 152, 155 (3rd Cir. 1977). *Maugnie*, 549 F.2d at 1260–62.[2]

To adequately apply the fact-based approach adopted by *Maugnie*, it is necessary to explore the reasoning of both *Day* and *Evangelinos*. Both decisions confronted the same historical event — in the transit lounge of an airport in Greece, two terrorists subjected a line of passengers to a vicious act of terror as they prepared to board a flight to New York, leaving three dead and more than forty others injured. Both decisions, interpreting Article 17's "operations of embarking or disembarking" language, rejected an approach that looked primarily at the location of the passenger. Instead, the decisions settled on an approach they felt better comported with the plain meaning of Article 17 and the Convention's relevant history, by looking primarily to (1) the activity the passenger was engaged in, (2) the passenger's location, and (3) the control of the airline over the passenger, all at the time of the accident.

The official version of the text, written in French, reads "au cours de toutes operations d'embarquement et de debarquement." To illicit the plain meaning, *Day* examined the French dictionaries of its time and settled on the following definition for the French word "operation":

---

[2] The strict interpretation that this "more flexible interpretation" is relative to interprets the embarking operations "as essentially the physical activity of entering an airplane." *Maugnie*, 549 F.2d at 1259.

5

"[A] group of procedures combined to achieve a result." *Day*, 528 F.3d at 33 n.7. The plain meaning of Article 17 thus placed the lined-up passengers unquestionably in the process of embarking and under the control of the airline as its agents directed and oversaw their security check. During this necessary process, "[t]he passengers were not free agents roaming at will through the terminal." *Id.* at 33–34.

The debates of the delegates considering the Warsaw Convention also guided *Day* and *Evangelinos*. The Comite Internationale Technique d'Experts Juridique Aeriens provided a preliminary draft of the Convention that imposed liability on carriers "from the moment when the travelers . . . enter[ed] the aerodrome of departure, up to the moment when they le[ft] the aerodrome of destination." *Evangelinos*, 550 F.2d at 157. The delegates expressly rejected this aerodrome-to-aerodrome approach, opting instead for the current version. The defendants argued that the delegates' rejection compelled a strict reading of Article 17. *Evangelinos* found, however, that "[t]he most that can be said is that the draftsmen rejected the concept of automatic liability . . . for all accidents within the limits of the departing or arrival aerodromes." *Id.* at 158. Further, "[t]he debates indicate[d] that the principal fear was that carriers would be liable for injuries sustained by passengers at times when the airline had no control over what the passengers were doing." *Id.* at 158 n.13.

With this reasoning in mind, our court of appeals assessed the circumstances in *Maugnie*, 549 F.2d at 1262. There, the passenger had deplaned and proceeded toward a different airline's gate to make her connecting flight when she slipped and fell in a common passenger corridor "neither owned nor leased by Air France," the airline of the flight she arrived on. Finding she was acting at her own direction and was no longer under the control of Air France, *Maugnie* held that unlike the passengers in *Day* and *Evangelinos*, their plaintiff had completed the disembarkation operations contemplated by Article 17. *Id.* at 1262.

The plaintiff in *Schmidkunz*, 628 F.2d at 1207, similarly slipped and fell approximately 500 yards from the boarding gate in a common passenger area of the terminal after deplaning and while waiting for her next flight on a different airline. She had not received her boarding pass,

was not imminently preparing to board the plane, and the defendant's personnel exercised no control over her. On these facts, reliance on Article 17 was ruled out.

Finally, in *Lathigra*, 41 F.3d at 536–37, a British Airways passenger sued the airline for negligence after being stranded in Nairobi for five days because her connecting flight had been discontinued. "Days" before the flight, the plaintiff called British Airways and confirmed her reservations but was not informed of the discontinuance. British Airways attempted to apply the Warsaw Convention and its statute of limitations, which had expired for the plaintiff, but *Lathigra* held the action was outside the scope of Article 17's statute of limitations, as it "applie[d] only to actions . . . related to the *performance* of the international transportation." *Id.* at 538. The decision did not analyze *Maugnie* or *Schmidkunz* but it briefly noted that its holding should be interpreted consistently with those decisions. *Id.* at 539 n.6. Explaining that *Maugnie* and *Schmidkunz* declined to apply the Convention's liability limits to actions for injuries occurring inside airport terminals, *Lathigra* stated:

> Thus, these cases involve additional restrictions on the Convention's reach beyond those inherent in our approach here, requiring "an assessment of the total circumstances surrounding a passenger's injuries." *Maugnie*, 549 F.2d at 1262. Both *Maugnie* and *Schmidkunz* involved passengers who slipped and fell in terminal *common* areas while making connections between carriers at foreign airports.

*Ibid.* (emphasis in original). Defendants argue that *Lathigra* reiterates supposed precedent from our court of appeals that "excludes recovery against a carrier for passengers' injuries that occur during transit through common areas of airports from the scope of carrier liability under Article 17" (Dkt. No. 18 at 9–10). Not so. To the contrary, *Lathigra* recognized that an assessment of the total circumstances must be performed, citing *Maugnie*.

*Maugnie*, *Schmidkunz*, and *Lathigra* clearly do not support what defendants insist is "well settled law [in our court of appeals] . . . that Article 17 does not apply to 'accidents' that occur while a passenger is merely transiting between two flights on airport premises" (Dkt. No. 18 at 12). The total circumstances, rather, surrounding the passenger's injury must be assessed to determine whether they were in the course of any of the operations of embarking or disembarking. Applying this standard, and primarily using the three factors from *Day* and

7

*Evangelinos*, this order nevertheless holds that Adelson's complaint is insufficient to state a claim.

As to his location, Adelson's allegations do not reveal his location relative to his connecting flight, despite alleging it was also with British Airways and that he traveled within the secured area of Heathrow. As to the nature of his activities, Adelson's complaint says little about the activities he was engaged in as they related to the operations of embarking or disembarking. He allegedly was traveling on inter-terminal transportation between Gate 3 and Terminal 5 but he did not include any factual allegations related to his intentions upon entering the terminal. He could have been headed directly to the gate of his connecting flight *or* headed to a restaurant for a meal or to pursue a different detour.

As to the airline's control over Adelson at the time of the accident, he alleged that the defendants, "as common carriers, had and exercised control over Plaintiff's progress, transfer, and movement into the Terminal 5 building and any manner of ingress thereto, including doors and entrances, and/or were responsible for a safe and secure place to exit the inter-terminal transportation and enter Terminal 5" (Compl. at 3). These are mere conclusory statements lacking factual support and thus fail to satisfy the plausibility standard in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). There must be allegations explaining how defendants controlled Adelson and what made them responsible for errant doors at Heathrow. To be sure, the Court is concerned that defendants are insisting upon evidentiary facts beyond the reach of plaintiff at this stage, but the Court believes more can be pled on information and belief as to the control issue if counsel were to make use of the internet in their investigation of Heathrow Airport.

Adelson fails to establish under these three factors, or any other circumstances, that he was engaged in the operations of embarking or disembarking as understood by our court of appeals in interpreting Article 17. To find otherwise would go beyond the intended meaning of Article 17, establishing liability merely because Adelson was injured in an airport while carrying an international flight ticket. Defendants' motion is **GRANTED**.

Adelson may, however, file a motion seeking leave to amend his complaint. Contrary to defendants' arguments, Adelson's opposition includes what begins to reveal a plausible theory of

relief.  There, Adelson says he held his boarding ticket, traveled directly to Terminal 5 to make his connecting flight, and that he did not pursue excursions into public areas or to the main terminal for shopping or other activities (Dkt. No. 27 at 4).  He further says British Airways controlled his every move because Terminal 5 is a main British Airways global base, most of its flights go through Terminal 5, and few other carriers use the terminal.  It is still unknown who manages or controls the terminal but more detailed allegations are possible.  He also says British Airways controls which airplanes go to which gate and how a passenger may get from one gate to another.  Finally, he states that "departing from the bus, walking to the door in question, and passing through the door and on to the designated gate are each and all inherent and indispensable 'operations of embarking or disembarking'" (Dkt. No. 27 at 5).  This proposition may be legally supportable if Adelson can show that these were conditions imposed by the airline for embarking on his next flight, rather than conditions imposed by the airport or the country, as may be the case for security or baggage procedures.  Bearing in mind the standard set by our court of appeals for an Article 17 claim, Adelson may file a motion seeking leave to amend his complaint.

### 3. CONTRACTING CARRIER UNDER THE MONTREAL CONVENTION.

Defendants additionally argue Adelson failed to state a claim against American Airlines because the complaint did not allege American Airlines was a carrier as required under the Montreal Convention.  Adelson, in his opposition, disagrees that American Airlines was not an actual carrier but focuses primarily on his new theory that American Airlines was at least a contracting carrier.  The theory in his opposition is that American Airlines was able to issue him the tickets for the British Airways flights and another airline through the "One World" airline alliance.

In his complaint, however, Adelson merely alleged:

> In connection with his work, on or about December 16, 2015, he purchased air transportation from San Francisco to Delhi, India for a medical conference.  This ticket, consisting of several flight legs with One World Partner Airlines were [sic] purchased with American Airlines Advantage Award miles, and were identified on American Airlines record locator under ID "MOHZSR, which includes his outgoing travel."  On the return, January 15, 2016, he was ticketed Finnair flight 22 from Delhi to Helsinki (HEL); British Air 799 from Helsinki to London Heathrow (LHR), and British Airways 183 from LHR to JFK, New York, United States.

Thus, American Airlines would be connected to this action only by reason of the air miles Adelson used. Adelson does not allege any contract between American Airlines and himself was formed. On this theory, Adelson could sue Visa or Mastercard or any number of cash alternatives. That cannot be what the Montreal Convention contemplated. As such, defendants' motion is **GRANTED** on this claim as well.

Defendants also believe Adelson cannot cure his claim if he were given leave to amend. Defendants rely on Article 39 of the Montreal Convention to define actual carrier and contracting carrier. Article 39 reads:

> The provisions of this Chapter apply when a person (hereinafter referred to as "the contracting carrier") as a principal makes a contract of carriage governed by this Convention with a passenger or consignor or with a person acting on behalf of the passenger or consignor, and another person (hereinafter referred to as "the actual contractor") performs, by virtue of authority from the contracting carrier, the whole or part of the carriage, but is not with respect to such part a successive carrier within the meaning of this Convention. Such authority shall be presumed in the absence of proof to the contrary.

It is not clear why Article 39 applies and defendants' authorities are of little use. Defendants cite to several non-binding decisions and one decision from our court of appeals that is unrelated to the issue, *Chubb Insurance Company of Europe, S.A. v. Menlo Worldwide Forwarding, Inc.*, 634 F.3d 1023, 1027 (9th Cir. 2011). *Chubb* is relegated to the end of a string cite that follows the reprinted text of Article 39. Parenthetically, defendants quote a portion of *Chubbs* stating Article 45 allows an action for damages to be brought against an actual carrier, a contracting carrier, or against both together or separately (Dkt. No. 18 at 13). This decision does not explain why American Airlines cannot be a carrier under any allegation brought by Adelson. Defendants also rely on the article-by-article analysis of the Montreal Convention, *reprinted in* S. Treaty Doc. No. 106-45, 1999 WL 33292734 (2000). The analysis provides examples of contracting carrier/actual carrier operations, "includ[ing] code-share operations and operations where one carrier offers service using an aircraft and crew leased from another carrier." *Ibid*. There is no authority provided to support finding this list exhaustive or persuasive. Well-pled allegations describing a contractual relationship connected to American Airlines and One World may yet survive. As such, Adelson may seek leave to amend on this claim as well.

10

**CONCLUSION**

For the foregoing reasons, defendants' motion for judgment on the pleadings is **GRANTED**.

By **JUNE 1 AT NOON**, Adelson may seek leave to amend the dismissed claims by a formal motion noticed on the normal 35-day calendar. Adelson must plead his best case. His motion should affirmatively demonstrate how the proposed first amended complaint corrects the deficiencies identified in this order, as well as any others raised in defendants' motion but not addressed herein. The motion should be accompanied by a redlined copy. Failure to timely file a motion seeking leave to amend will result in judgment in favor of defendants American Airlines, Inc., and British Airways, PLC.

**IT IS SO ORDERED.**

Dated: May 24, 2017.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

11